Citation Nr: 1710366 
Decision Date: 03/31/17 Archive Date: 04/11/17

DOCKET NO. 10-03 511 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Montgomery, Alabama


THE ISSUE

Entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU) prior to April 6, 2013.


REPRESENTATION

Appellant represented by: The American Legion


ATTORNEY FOR THE BOARD

M. Yuan, Associate Counsel


INTRODUCTION

The appellant is a Veteran who served on active duty from November 30, 1992 to May 21, 1993, May 8, 2003 to April 24, 2004, and March 19, 2007 to January 15, 2008. This matter is before the Board of Veterans' Appeals (Board) on appeal from an August 2008 rating decision of the Montgomery, Alabama Department of Veteran Affairs (VA) Regional Office (RO). The prior May 2016 Board decision by another Veterans Law Judge (VLJ) found the matter of entitlement to TDIU prior to April 6, 2013 had been reasonably raised by the record in conjunction with an appeal for increased rating. Thus, the Board took jurisdiction over that claim pursuant to Rice v. Shinseki, 22 Vet. App. 447, 455 (2009). The matter was then remanded, and is now before the undersigned.


FINDINGS OF FACT


Prior to November 8, 2010 (but not earlier than January 15, 2008), the evidence reasonably shows that, considering the Veteran's education, relevant work history, and experience, her service-connected disabilities) rendered her unable to obtain or follow substantially gainful employment.


CONCLUSION OF LAW

TDIU is warranted from January 15, 2008 to November 8, 2010. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.19, 4.25 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Veterans Claims Assistance Act of 2000 (VCAA)

As the Board has taken jurisdiction of this matter sua sponte under Rice, the Veteran has not been explicitly provided the applicable notice for TDIU claims. Nonetheless, the Board notes that she has previously applied for TDIU on multiple occasions, and has been made aware of the types of evidence needed to substantiate that claim, as well as VA's duties under the law by letters dated in October 2008 and July 2013. Moreover, after the May 2016 remand ordering the Agency of Original Jurisdiction (AOJ) to consider the matter in the first instance, a supplemental statement of the case (SSOC) was issued including notice of the relevant regulatory provisions. The Veteran has not alleged that any notice was less than adequate in this matter. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). 

In addition, the Veteran's service treatment records (STRs) and pertinent postservice treatment records have been secured. The AOJ substantially complied with the Board's May 2016 remand instructions ordering adjudication of the matter in the first instance. Although no examination has technically been provided in conjunction with this particular adjudication, the Board notes that June 2008 and December 2008 VA examinations were previously provided that adequately address the impact of her then-service connected disabilities on her occupational and daily functioning. Notably, the current appeal involves the Veteran's functional impairment in the past, and any further development for medical opinions would not add materially to the probative value of the record overall. Critically, the Board is granting the Veteran's claim (to the extent that such a grant is legally possible), and the Veteran has not alleged that any pertinent evidence remains outstanding or that development of this matter has been inadequate. VA's duty to assist is met.

Legal Criteria, Factual Background, and Analysis

VA will grant a total rating for compensation purposes based on individual unemployability when the evidence shows that, by reason of service-connected disability, the veteran is precluded from obtaining or maintaining substantially gainful employment consistent with his or her education and occupational experience. 38 C.F.R. §§ 3.340, 3.341, 4.16. Age, however, will not be considered. Id. at § 4.19.

A TDIU rating for compensation purposes may be assigned where the schedular rating is less than total, when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of a single service-connected disability ratable at 60 percent or more; or if there are two or more service-connected disabilities, provided at least one disability is ratable at 40 percent or more, and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.340, 3.341, 4.16(a). Substantially gainful employment is defined as work which is more than marginal and which permits the individual to earn a living wage. Moore v. Derwinski, 1 Vet. App. 356 (1991). 

Prior to April 6, 2013, the Veteran was service-connected for a specific phobia of enclosed spaces (rated 50 percent from January 15, 2008); multiple sclerosis (rated 30 percent from January 15, 2008 to March 16, 2011); migraine headaches (rated 30 percent from January 15, 2008); decreased sensation in the right upper extremity (rated 30 percent from March 16, 2011); decreased sensation in the left upper extremity (rated 10 percent from January 15, 2008 and 20 percent from march 16, 2011); decreased sensation in the right lower extremity (rated 20 percent from March 16, 2011); decreased sensation in the left lower extremity (rated 10 percent from January 15, 2008 and 20 percent from March 16, 2011); impairment of his visual field (rated 10 percent from March 16, 2011); residual keloid scars (rated 0 percent from January 15, 2008); and swallowing difficulties (rated 0 percent from March 16, 2011). Together, these yielded a combined rating of 80 percent from January 15, 2008 and 90 percent from March 16, 2011. Therefore, she satisfies the schedular criteria laid out in 38 C.F.R. § 4.16(a). Thus, the Board must determine whether the Veteran's service-connected disabilities indeed rendered her unable to follow or obtain substantially gainful employment given her education and relevant experience.

The Board notes that it has reviewed all of the evidence in the record. Although the Board has an obligation to provide reasons and bases supporting its decision, there is no need to discuss every piece of evidence. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000). Hence, the Board will summarize the relevant evidence as deemed appropriate, and the Board's analysis will focus specifically on what the evidence shows, or fails to show, as to the claim.

The Veteran's STRs contain multiple notations regarding treatment for symptoms or manifestations of multiple sclerosis, including physical impairments (i.e., numbness in the hands, weakness, etc.) that caused significant problems. Notably, a December 2007 service record indicates she was "physically incapable of reasonably performing her duties as a 44C20/Finance [noncommissioned officer (NCO)] due to her multiple sclerosis." Specifically, her condition caused numbness in the hands that prevented her from performing input functions or "excessive use of her hands," both of which were a significant part of the job, because she was routinely required to manage disbursement, travel, military pay, foreign national pay, internal control, and civilian pay operations. Thus, it was recommended that she be considered unfit for reasonable performance of her duties. 

On June 2008 VA psychiatric examination, the examiner diagnosed the Veteran with a specific phobia of enclosed spaces, and found it caused occupational and social impairment with both reduced reliability and productivity and deficiencies in most areas, specifically including judgment, work, thinking, and mood. Although the Veteran said her usual occupation was in retail sales, she was not employed at the time because of her anxiety and depression. The examiner indicated she would be impaired at work insofar as "[h]aving to [perform] duties in close proximity to large groups of others in closed locations creates the initial stimulus for activation of [the] Veteran's fear network that creates a kindling effect of how others are [perceiving] her while experiencing extreme levels of anxiety. This then results in poor judgment and loss of capacity to function in occupational protocols." The examiner also indicated that the Veteran had a tendency to "ruminate" when experiencing anxiety and panic in social situations, which resulted in "self-generated scenarios of annihilation and further anxiety." This would also escalate into anxiety of how she is perceived by others, enhancing the duration of her anxiety and adding subsequent depression. Moreover, the "constant self-monitoring" of people's perceptions of her panic and anxiety episodes destabilized her mood, causing her to become "obsessed with being labeled and stigmatized as being crazy," leading to further ruminations, senses of impending doom, fears of her daughter's welfare, and depression. The examiner also indicated that the Veteran's judgment was compromised because her persistent anxiety and sense of impending doom led her to often make "rash decisions that are uniformed and at times irrational" or "not based on available evidence, such as leaving work inappropriately without proper notification." The examiner opined that she could "still manage to function at this current level . . . by identifying an occupation that does not trigger her anxiety disorder (being in large crowds and enclosed spaces)."

On June 2008 VA neurological examination, the Veteran reported diagnoses of migraine headaches and relapsing-remitting multiple sclerosis. She said her multiple sclerosis caused numbness in both arms and below her waist. Although she had undergone treatment with some improvement in symptoms, they were not fully resolved and she continued to have numbness and weakness in the upper and lower extremities. She indicated that excessive physical work, in particular, caused weakness in the left side, and she felt as if she had a "stroke." She reported migraine headaches occurring three times per week that required her to go in a dark room and lie down. The headaches usually lasted anywhere between two to four hours and, afterwards, she was usually groggy from medications she took to treat them. The Veteran said she worked as a secretary in the military, but was not working at the time, and had no plan to do so, because her headaches and weakness prevented her from being gainfully employed. She said she "cannot be calling in sick too often." At the time, she was able to manage her medical problems because she was staying at home, which allowed her to take medications and lie down (in the case of her headaches) or "take it easy and . . . try to walk slowly, holding onto the wall for support" (in the case of multiple sclerosis). The examiner did not comment on the expected functional impact of any disabilities.

In a September 2008 application for TDIU, the Veteran indicated that she had last worked full-time in January 2008 (on the date of her discharge), after which she was too disabled to work. She noted a history of work as an administrative NCO in the Army and as a pay clerk in the civil service. She did not report any education or training. 

On December 2008 VA examination, the Veteran said she had not held a job since the last examination. She said she received interferon injections three times a week, which left her with flu-like side effects, including fatigue. She also said she generally tired easily and required two or three hours of rest each day. The Veteran also said she could not walk for longer than 30 minutes because of left-sided weakness. She also reported migraine headaches every day, in different locations. Following a physical examination, the examiner diagnosed multiple sclerosis that caused mild, scattered, and decreased sensation in hands and feet and fatigue. However, she had normal motor function of both arms and legs. Based on the examination, the examiner opined that the fatigue and loss of sensation in her extremities caused by multiple sclerosis would prevent manual labor, but that she had "good response to treatment of her [multiple sclerosis] and no chronic neurological deficits were noted in her recent medical records." The examiner then opined that "[f]unctional limitations that would interfere with her ability to obtain and maintain sedentary employment were not identified." The examiner did not provide an opinion on the functional impact of headaches because it was felt that migraines were not actually reported at that particular examination. 

A June 2009 VA treatment record notes the Veteran completed nearly two years of college, but did not note any specific areas of study. In a November 2009 private record, the Veteran reported her first relapse of multiple sclerosis since initial diagnosis in 2007. However, she noted that her fatigue had improved since the episode, and she was back to exercising regularly. Unfortunately, she had been feeling as though her left hand was clumsy for the prior month, saying it "doesn't want to do what she wants it to do." This was also said to be an intermittent problem. She also reported three "bad" migraines in the prior month, which was unusual. In April 2010, the Veteran reported numbness from her waist down that began earlier that month. She said her migraines had also flared significantly in the prior weeks. Normally, they occurred twice a month and required lying down in a dark room. The provider noted that the exacerbation of her multiple sclerosis was her third in the past six months, indicating the first happened in early November 2009, followed by an episode of optic neuritis in January 2010. The present episode apparently involved transverse myelitis. It indicates that she saw a Dr. B. in December 2009 and was having infrequent relapses at the time. Records later that month indicate her numbness had receded to the midcalf level, and she was feeling better. Her private doctors noted that perhaps a change in medication was in order. 

In February 2011, private records show the Veteran had apparently returned to work in November 2010. However, she reported extreme fatigue and felt that may have been a mistake. Specifically, she noted that she had to travel an hour each way to get to and from work, and by the time she arrived home, was totally exhausted, and needed to go to bed at 7:30. Although she could not work any closer to home, she had not asked for fewer hours because she was motivated to try despite the difficulty presented. The Veteran also reported an exacerbation of her migraines as well. The following month, VA records note reports of numbness and tingling in hands due to multiple sclerosis. She also reported two severe migraines that month. In May 2011, private records indicate the Veteran was still working and continued experiencing extreme fatigue, likely related to multiple sclerosis. The examiner noted she had a difficult work schedule that was compounded by a long drive to and from work.

In October 2011, the Veteran reported numbness and paresthesias in her left inner thigh, inner calf, and the plantar surface of the left foot over the prior two weeks. She had also been "extremely exhausted" and indicated she still had to travel an hour each way to get to and from work. The examiner noted extreme fatigue that was most likely secondary to multiple sclerosis. However, the Veteran had not had a relapse of her multiple sclerosis since April 2010. A November 2011 letter from the Veteran's private doctor (Dr. Shashy) indicated the Veteran had tried to continue working but was disabled by her fatigue as a result of multiple sclerosis. A subsequent April 2012 letter from a private neurologist (Dr. Miller) indicates the Veteran's multiple sclerosis limited her to activities of daily living and rendered her unable to work on a sustained basis. The doctor indicated his findings were confirmed through physical examinations, medical history, MRIs, and standard neurological examination, including evaluations of her strength, spasticity, coordination, gait, sensation, vision, and mental status. The Veteran's symptoms included optic neuritis, paresthesias, numbness, weakness, neurogenic bladder, visual disturbances, cognitive dysfunction, mood swings, severe anxiety, and overwhelming fatigue. Although the Veteran had "made every effort to continue gainful employment . . . the physical impairment caused by advancing multiple sclerosis have made this no longer possible." The doctor explained that multiple sclerosis is a progressive neurological disorder, and while disability can be delayed with treatment, there is no cure, and the expectation would be that the Veteran would continue to decline in function over time.

At the outset, the Board notes that the evidence quite clearly shows the Veteran's service-connected disabilities, and particularly her multiple sclerosis, preclude her from engaging in any physical work. In fact, her December 2008 VA examiner expressly noted that she was incapable of performing manual labor. Therefore, the Board concedes that point. In addition, it should be noted that, prior to January 15, 2008, the Veteran was not service connected for any disabilities, and therefore TDIU cannot be granted prior to such date. Similarly, the Veteran was employed full-time between November 8, 2010 and April 5, 2013, and therefore there can be no basis for awarding TDIU for that period either, as she was clearly able to obtain and follow substantially gainful employment during that time. Consequently, the question for the Board's consideration is whether the Veteran's service-connected disabilities (at the time) precluded her from engaging in nonphysical, or sedentary, occupations between January 15, 2008 and November 8, 2010. 

While it is clear that the Veteran's service connected disabilities may not have prevented her from ever working during the period on appeal, there is significant evidence indicating they-in particular, multiple sclerosis-significantly impaired her ability to perform any meaningful, sustained employment, even in sedentary positions. Although the Veteran's entire work history has consisted of sedentary work (i.e., clerical positions in payroll and finance departments), such jobs nonetheless have some physical components that posed problems given her multiple sclerosis. For example, a December 1996 description of the civilian pay technician position shows that such work requires bending, walking, standing, and carrying light objects. Moreover, as noted above, her service records indicate a major function in that type of work involves data input and typing. The Veteran's STRs and postservice treatment records show her multiple sclerosis causes numbness and weakness in the extremities that would significantly interfere with or, in the case of her work in service, wholly preclude performing even casual physical activities. Most notably, her weakness has been shown to interfere with her ability to manipulate her hands during and after service. Thus, it is highly likely that her multiple sclerosis would have prevented her from even carrying out the relatively simple physical requirements of sedentary and clerical work.

The evidence also suggests that service-connected disabilities would have further impeded her ability to maintain regular attendance, even in sedentary positions. In so finding, the Board first notes that any full-time employment would typically require, at a minimum, somewhat regular and consistent attendance. However, during the period on appeal, the Veteran's service-connected headaches were said to occur as frequently as every single day, causing incapacitation for several hours with grogginess afterwards. The December 2008 VA examination report indicates she also received interferon injections for multiple sclerosis thrice weekly, after which she would experience flu symptoms and fatigue. It is also well-documented that her multiple sclerosis caused generalized fatigue which required significant time resting. Together, it is difficult to see how these factors would be consistent with the sustained maintenance of a regular and consistent work schedule. 

Furthermore, the evidence indicates the Veteran would have likely had significant difficulty coping with the circumstances (i.e., environmental and social aspects) of sedentary work. Such work typically involves office settings and interaction with supervisors, coworkers, and outside actors. In fact, the December 1996 description referenced above indicates that a civilian pay technician must interact with people outside the immediate organization in ways that exceed the simple exchange of information. However, the June 2008 psychiatric examination report shows the Veteran's service-connected phobia of enclosed spaces (that caused deficiencies in most areas of functioning, including thinking, mood, judgment, and work) specifically precluded any work with large groups of people in enclosed spaces because it would cause a downward spiral of self-exacerbating anxieties and fears. It also left her judgment and thinking compromised, leading to irrational decisions (including leaving work inappropriately), and a prominent component of her psychiatric impairment was anxiety about others' perceptions of her. Moreover, the Veteran's multiple sclerosis has been noted to cause mood swings and other psychiatric exacerbations as well. It would be more than reasonable to conclude that such severe psychiatric impairments would make consistent, sustained functioning in the types of environments typical to sedentary positions unrealistic.

The Board has also finds the circumstances of all her past employment, particularly as it relates to the course of her service-connected disabilities (most notably her multiple sclerosis), is especially instructive in this matter, as it provides much-needed context that further supports an award of a TDIU during the period on appeal. As noted above, she has, essentially, only worked in clerical positions in finance and payroll departments. During service, she was explicitly deemed unable to perform that work due to her multiple sclerosis. Thereafter, she received various treatments for multiple sclerosis but later experienced three exacerbating episodes (relapses) between November 2009 and April 2010 that prompted her private doctors to change her medication in an attempt to preempt further exacerbations. Given her medical history, it is clear that she did not return to work until several months after she had her medication changed to treat debilitating relapses of multiple sclerosis, during a period of relative remission. Even after returning to work, she continued to battle significant impairment due to her multiple sclerosis (such as extreme fatigue) and was eventually forced to medically retire. A May 2013 VA examination report-after she had left work again-indicates that she was forced to retire due to additional "frequent exacerbations of her multiple sclerosis" that rendered her unable to perform any type of quality employment. Notably, her private doctors had previously documented that precise finding in 2011 and 2012 statements noting she was having difficulty coping with her multiple sclerosis symptoms. The Board finds it particularly relevant that those findings were dated in each of the two years between the Veteran resuming employment in 2010 and her medical retirement in 2013, because it suggests her service-connected multiple sclerosis did not abate at any point, but was simply relatively more manageable while still presenting incredible challenges to maintaining sustained employment.

It is clear that the Veteran's disability involves recurring periods of exacerbation (with severe functional impairment) and intervening periods of remission (during which she can technically function, albeit with significant difficulty). This is wholly consistent with her precise diagnosis of "relapsing-remitting multiple sclerosis," and the fact that multiple sclerosis is, by definition, a disease characterized by a "usually prolonged" course. See Dorland's Illustrated Medical Dictionary, p. 1706 (31st. Ed. 2007). Thus, considering the totality of the evidence, the Veteran's period of work appears to have been an unsuccessful attempt to engage in gainful employment despite her chronic and recurrent multiple sclerosis. 

Consequently, the Board finds that, prior to November 8, 2010 (but not earlier than January 15, 2008), the evidence reasonably shows that the Veteran's service-connected disabilities, and in particular her multiple sclerosis, effectively rendered her unable to (1) maintain a regular and consistent work schedule; (2) perform even basic physical tasks required in sedentary jobs; and (3) cope with the environmental and social circumstances typical to sedentary jobs. 

In so finding, the Board is aware that there is evidence suggesting the Veteran could have worked during the period on appeal. Specifically, the December 2008 VA examiner found no evidence of impairment that would preclude sedentary employment and the June 2008 psychiatric examiner indicated the Veteran could work in environments that would not trigger her phobia. However, the December 2008 VA examiner's opinion was based on a finding that the Veteran was doing relatively well with treatment and there was no documented evidence of chronic neurological deficits. Given the inherent chronicity of multiple sclerosis, the several notations of recurring numbness and weakness in the record, and the evidence indicating multiple periods of normalcy have been interrupted by debilitating exacerbations, the Board finds that opinion wholly inconsistent with the Veteran's disability picture. Similarly, the criteria for feasible employment articulated by the June 2008 examiner creates a relatively narrow pool of options, particularly when considering the additional physical impairments presented by her multiple sclerosis. When put in proper context, the opinion essentially states that the Veteran would have been able to work (1) in an open workspace, and (2) in a workspace that is not given to people gathering in groups and (3) within reasonable commuting distance, and (4) in a job that involves very limited amounts of typing, other fine motor manipulation, or more substantive physical activities (like bending, stooping, etc.) and (5) has flexible hours and/or an exceedingly generous leave policy. Even if such a position did exist, it would essentially be accommodating the Veteran's precise impairments-which, under the applicable law, would not qualify as obtaining and maintaining substantially gainful employment because it would amount to employment in a protected environment. See 38 C.F.R. § 4.16(a). 
The Board is aware that the analysis above focuses largely on the effect the Veteran's disabilities had on her ability to perform clerical work in particular. While the Board is certainly aware that other types of sedentary work exist, there are two notable points to be made. First, the aspects of clerical work discussed above-relatively low-impact physical requirements, fine motor skills (i.e., writing, typing, manipulating paper and light objects), interacting with other people, working in an office setting-are also common aspects of sedentary jobs in general. Second, as previously discussed, the Veteran has essentially only worked in clerical positions, and specifically in payroll and finance departments. Moreover, there is no evidence that she has ever had any education, training, or other experience that would equip her to leave her usual occupational area. The Board acknowledges that there are notations of past retail work and nearly two years of college, but finds that retail work is inconsistent with the physical limitations posed by her disabilities and there is simply no evidence that the reported college experience yielded any degree, experience, or certification that could empower a career change.

Accordingly, the Board finds that the evidence is at least in relative equipoise as to whether or not the Veteran's service-connected disabilities rendered her unable to obtain or follow substantially gainful unemployment during the period on appeal, particularly considering her education and relevant experience. Resolving all remaining reasonable doubt in the Veteran's favor, the appeal must be granted.


ORDER

TDIU prior to November 8, 2010 (but not earlier than January 15, 2008) is granted.


____________________________________________
VICTORIA MOSHIASHWILI
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs